FILED
2013 Mar-25  AM 11:49
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| TERESA SCOTT-BOLTON, | ) | |
| | ) | |
| Plaintiff; | ) | |
| | ) | |
| vs. | ) | 7:12-cv-0800-LSC |
| | ) | |
| STATE OF ALABAMA BOARD | ) | |
| OF PARDONS AND PAROLES, | ) | |
| | ) | |
| Defendant. | ) | |

## Memorandum Opinion

### I.    Introduction

Before the Court is a Motion for Summary Judgment, filed on September 26, 2012, by the defendant, the Alabama Board of Pardons and Paroles (the "Board"). (Doc. 24.) The Board's motion is fully briefed and ripe for review. For the reasons described below, the Board's Motion for Summary Judgment is due to be GRANTED.

### II.    Facts[1]

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual

The plaintiff, Teresa Scott-Bolton ("Bolton"), filed this action on March 13, 2012, alleging that she was unlawfully discriminated against because of a disability in violation of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. (Doc. 1.) On July 26, 2012, this Court entered an order dismissing Bolton's ADA claim. (Doc. 19.) Bolton's claim under the Rehabilitation Act remains pending at this time and is the subject of the present Motion for Summary Judgment.

Bolton was formerly employed with the Board as a Probation and Parole Officer ("Probation Officer"). The majority of a Probation Officer's job duties involve desk work, such as conducting pre-parole investigations for the Board on prisoners serving in state penal institutions, and pre-sentence investigations for courts with probationary power. (Docs. 24-17 & 25-12.) Probation Officers are also occasionally required to go into the field to effect arrests of individuals in violation of their probation or parole. (Doc. 25-12.) When applying for a position as a Probation Officer, applicants complete a questionnaire confirming they will be able to "[m]ake home visits and effect arrests in any area to which [they] are assigned to include low income housing projects and confirmed 'crack houses.'" (Doc. 24-17.)

---

facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

In instances where Probation Officers go into the field to make arrests, they may be required to use firearms, handcuffs, and other law enforcement equipment in order to comply with the orders of the court and to protect themselves, other officers, or the general public. (Doc. 25-12.) Thus, the Alabama Peace Officers Standards and Training Commission ("APOSTC") requires that all Probation Officers be certified to carry firearms and complete mandatory firearm re-qualifications on an annual basis. *See* Ala. Admin. Code r. 650-X-12-.03. The application questionnaire notifies applicants of this requirement by having applicants indicate whether they believe they will be able to become "certified in the use of firearms (handgun and shotgun)" and be able to "[a]ttend and successfully complete mandatory firearms re-qualification with a handgun each year." (Doc. 24-17.) Additionally, section 10.2.02(3) of the Board's Policy Manual provides that "APOST-certified probation and parole officers . . . are required to carry the departmentally issued firearm while on duty." (Doc. 27, Ex. H at 286.)

Bolton suffers from multiple sclerosis ("MS"), which can impede her ability to engage in physical activities when the condition is activate. While participating in a running and shooting weapons re-qualification test in June 2010, Bolton's MS flared-up due to the heat. Bolton alleges that the MS attack prevented her from

passing the physically demanding weapons test. She also alleges that she requested a cooling-off period to allow time for her MS to subside, but the weapons course instructor denied her request.[2] Because Bolton failed the weapons test, her firearm was taken away and placed in the Anniston Probation and Parole Office. The Board then scheduled Bolton to retake her weapons test on a later date. During the interim period, the Board requested, and was granted, a waiver of the firearms re-qualification requirements for Bolton as provided in APOSTC Administrative Code Rule 650-X-12-.03(7). Bolton continued working as a Probation Officer during this period, performing the functions of her job which could be completed from her desk.[3] Bolton alleges that she requested a transfer to a permanent desk position, but was denied this accommodation. (Doc. 1 ¶ 10.) Bolton retook the weapons re-qualification test on September 30, 2010, but once again her MS prevented her from obtaining a passing score.

Bolton's overall health continued to deteriorate following the September 2010 weapons test. In October 2010, Bolton requested leave under the Family Medical Leave Act ("FMLA") to have surgery to remove polyps. While she was out for the

---

[2] The Board contends that it offered Bolton a cooling-off period, but that she refused the accommodation because she did not want to be perceived as receiving special treatment. For purposes of this motion, the Court views all facts in favor of the nonmoving party.

[3] The parties dispute whether Bolton was permitted to go into the field during this period.

polyp removal surgery, Bolton's suffered a MS attack that prevented her from returning to work. On February 28, 2011, approximately four months after Bolton began her leave, Bolton's FLMA coverage expired. (Doc. 24-11 at 2.) Because Bolton had exhausted her accrued FLMA leave, the Board informed her she would be required to pay the full amount of her insurance premiums in order to remain covered. On March 28, 2011, Bolton requested donated leave pursuant to Alabama Code § 36-26-35.2. (*Id.* at 7.) That request was approved by the Board, but denied by the State of Alabama Personnel Department because Bolton's condition was not a "catastrophic illness" as required by the statute. (*Id.* at 8.) Despite that Bolton's accrued FMLA leave was exhausted and her request for donated leave had been denied, the Board permitted her to remain on the payroll in leave without pay ("LWOP") status. Bolton remained on LWOP until October 6, 2011, the date of her alleged termination.

Bolton's period of absence extended for almost an entire year. During that time, the expected date for her return constantly changed. On February 14, 2011, Bolton provided the Board with a letter from her doctor stating that she would be having another surgery and would be incapacitated for at least six weeks. (Doc. 25-4 at 2.) In March, another doctor wrote a letter stating that Bolton could not walk without a

walker, and would not be able to work "unless she has significant improvement." (*Id.* at 3.) In May, Bolton's physician estimated that she would not be able to resume work until August 1, 2011. (*Id.* at 4.) On July 28, 2011, a few days before Bolton's anticipated August 1 return date, the prognosis changed once again, and Bolton's doctor stated she would be unable to return to work until October 1, 2011. (*Id.* at 5.)

On August 29, 2011, Bolton provided the Board with a letter from her doctor outlining the necessary accommodations she would need before returning to work in October:

> [Bolton] has a desire to try and work, but she would need accommodations at her work to allow that to happen. She would need ergonomically-designed work area, including her chair, with leg and foot rests, keyboards with large keys so that she could press the keys, and a rest for her wrist and arm, magnifiers to help with document reading, a close proximity to the restroom, hand rails in her work station OR a wide work station where she could use her walker, a flexible work schedule, and allowing her to have a nurse come in and give her steroids IV if those are required. She will need high-density lighting in her office area, and she should obviously do no running, long periods of standing or sitting, or heavy lifting. She would need periodic breaks, and the ability to wear tennis shoes.

(Doc. 24-16.)

When October finally rolled around, Bolton was still unable to resume working. On October 4, 2011, the Board received a letter from Bolton's doctor stating that she was incapable of returning to work, and that she would remain unable to work for an

indefinite period of time.[4] In light of this development, the Board notified Bolton that it would set a hearing to determine whether she was going to be able to return to work and whether she would be able to perform the duties of a Probation Officer. (Doc. 24-2.) The hearing was never held because Bolton submitted a signed letter of resignation on October 6, 2011, indicating that she did not request a hearing. (Doc. 22-13 at 3.) Bolton contends that her resignation was not of her own volition, but rather that she was coerced into resigning based on a promise that she would be notified of and recommended for new positions as they came available. (Doc. 26 at 8.)

On October 26, 2011, the Board announced the opening of a new position for a Probation and Parole Specialist ("Probation Specialist"). (Doc. 24-19.) Unlike the Probation Officer position, the Probation Specialist position did not require the employee to go into the field to effect arrests, nor did it require firearm certification. (*Id.* at 2.) Bolton contends that she was not notified when this new position became available. (Doc. 26 at 4.)  The Board ultimately filled the Probation Specialist position with another candidate.

## III.   Standard

---

[4] Bolton attested that she attempted to return to work on October 3, 2011, only to find that her desk area was cleared off and that someone else was occupying her work space. (Doc. 25-3 ¶ 6.) However, Bolton concedes that her doctor mailed the letter received by the Board on October 4, which stated she was incapable of returning to work. (Doc. 26 at 6.)

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted); see also Fed. R. Civ. P. 56(c). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. &*

*Networks Corp.*, 281 F.3d at 1224 (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.     Analysis

Bolton alleges she was unlawfully discriminated against on the basis of her disability in violation of § 504 of the Rehabilitation Act. Section 504 provides in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

The Board asserts two reasons summary judgment should be granted in its favor. First, it contends Bolton has not established that the Board is a "program or activity receiving Federal financial assistance" as required by the statute. 29 U.S.C. § 794(a). Second, it argues that Bolton is not an "otherwise qualified individual with a disability." *Id*. Because the Court agrees that Bolton is not a qualified individual with a disability, summary judgment is due to be granted.

### A.     Whether the Board is a "program or activity receiving Federal financial assistance"

A claim asserted under § 504 of the Rehabilitation Act is premised on the proposition that an entity receiving federal funding is under a federally enforceable duty not to discriminate on the basis of an individual's disability. As a threshold matter, the plaintiff must establish the defendant entity was a program or activity "directly benefitted by federal financial assistance." *Doyle v. Univ. of Ala. in Birmingham*, 680 F.2d 1323, 1327 (11th Cir. 1982) (quoting *Brown v. Sibley*, 650 F.2d 760 (5th Cir. 1981)). The Board contends that Bolton's claim under § 504 must fail because she has not made such a showing.

In *Doyle*, the plaintiff brought an employment discrimination action against the University of Alabama, asserting that "simply because [the university] was a recipient of federal funds," it was prohibited from discriminating against her under § 504. *Doyle*, 680 F.2d at 1326. The plaintiff, however, did not allege that the specific program by which she was employed was directly benefitted by federal financial assistance. *Id.* at 1327. The Eleventh Circuit dismissed the plaintiff's claim, holding that the mere fact that some of the university's programs receive federal funds "does not subject the entire university to liability" under § 504. *Id.* at 1326. The court stated:

> [I]t is not sufficient, for purposes of bringing a discrimination claim under section 504, simply to show that some aspect of the relevant overall entity or enterprise receives or has received some form of input from the federal fisc. A private plaintiff in a section 504 case must show

that the program or activity with which he or she was involved, or from which he or she was excluded, itself received or was directly benefited by federal financial assistance.

*Id.* at 1326–27 (quoting *Brown*, 650 F.2d at 769).

The Board contends that, like the plaintiff in *Doyle*, Bolton has failed to establish that the *specific* program which allegedly discriminated against her was the recipient of federal funding. The Court disagrees. Bolton asserted in her complaint that the Board "is a program receiving state and/or federal financial assistance" (Doc. 1 ¶ 5), and the Board's answer admits the veracity of this statement without qualification. (Doc. 10 ¶ 5.) This is a different situation than *Doyle*, where the plaintiff's pleading did not allege that the defendant's specific program received federal funding, and the defendant did not make any admissions related to its receipt of federal financial assistance. In light of the Board's admission in its answer that it is a program receiving federal funds, the Court cannot agree that plaintiff has failed to establish that the Board is an entity covered by § 504 of the Rehabilitation Act.

## B.   Whether Bolton is a "qualified individual with a disability"

To establish a prima facie case of discrimination under § 504 of the Rehabilitation Act, an individual must show (1) she has a disability; (2) she is otherwise qualified for the position; and (3) she was subjected to unlawful

discrimination as the result of her disability. *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999). The Board concedes that Bolton was disabled at all times relevant to this case. However, the Board asserts that Bolton's claim must fail because she was not otherwise qualified for her position as a Probation Officer.

A qualified individual with a disability is an "individual with a disability who, with or without reasonable accommodation can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).[5] An employer must provide reasonable accommodations for employees with known disabilities unless such accommodation would result in undue hardship for the employer. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). An accommodation is "reasonable"—and, therefore, required—only if it enables the employee to perform the "essential functions" of the job. *Id.* The plaintiff retains at all times the burden of establishing that reasonable accommodations were available. *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997) (citing *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)).

Before considering the availability of reasonable accommodations, the Court

---

[5] The Rehabilitation Act provides, in pertinent part, that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 *et seq.*)." 29 U.S.C. § 794(d). Accordingly, the ADA's statutory provisions and case law applying title I of the ADA apply with full force to Bolton's claim under the Rehabilitation Act.

must identify the "essential functions" of Bolton's job as a Probation Officer. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001). The essential functions of a job are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). In determining which functions are deemed essential, "consideration shall be given to the employer's judgment . . . and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Lucas*, 257 F.3d at 1258 (quoting *Earl*, 207 F.3d at 1365); *see also* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n) (listing additional factors to consider in determining whether a particular job function is essential).

The evidence establishes—and Bolton has failed to prove to the contrary—that maintaining firearm qualification and having the ability to go into the field to effect arrests are two essential functions of the job as a Probation Officer. The Alabama Administrative Code explicitly provides that all APOSTC certified enforcement officers, which would include Probation Officers, must successfully pass an approved firearms course on an annual basis. *See* Ala. Admin. Code r. 650-X-12-.03. When applying for a job as a Probation Officer, applicants are notified of these requirements through a questionnaire submitted with their employment applications, which asks

whether applicants will be capable of becoming " certified in the use of firearms" and "successfully complet[ing] mandatory firearms re-qualification with a handgun each year." (Doc. 24-17.) The questionnaire also advises that Probation Officers may be required to "make home visits and effect arrests" in areas such as "low income housing projects and confirmed 'crack houses.'" (*Id.*)

The evidence also clearly establishes that Bolton is unable to perform these functions. After two attempts, Bolton was unable to pass the firearm re-qualification exam and is therefore unauthorized to carry a weapon. Yet even if Bolton had passed the firearm re-qualification exam, she was nonetheless incapable of going into the field to make home visits or effect arrests at the time her employment was allegedly terminated. At that time, Bolton's physical strength was minimal and she was only capable of ambulating with the aid of a walker or hand rails. (Doc. 1 at ¶ 20; Doc. 24-16.) Being physically restricted in such a manner, Bolton was certainly incapable of going into the field to arrest individuals in violation of the terms and conditions of their parole.

Despite the aforementioned evidence, Bolton disputes that carrying a firearm and effectuating field arrests are essential functions of the Probation Officer position, and she offers several arguments in support of her position. First, Bolton contends

that the official one-page job announcement does not mention a firearm certification requirement. Failing to expressly include this requirement on the job announcement, however, does not render firearm certification a non-essential function of the job. The requirement that Probation Officers carry firearms was well documented in the state of Alabama's administrative code and in the Board's policy manual. Moreover, job applicants were aware of this requirement because they were forced to indicate their ability to perform these functions on the questionnaire filled out in connection with their employment applications.

Bolton next argues these functions should be deemed non-essential because the "majority of Bolton's job was paperwork, or desk work, and field arrests were minimal." (Doc. 26 at 16.) In furtherance of this argument, Bolton attested that she only "made about 20 field arrests in the four years [she] worked [for the Board]" and that she "never had a reason to draw her weapon." However, even if situations requiring Probation Officers to make field arrests rarely occur, this does not mean that making field arrests is not an essential function of the job. *See Holbrook*, 112 F.3d at 1527.

In *Holbrook*, the Eleventh Circuit rejected a visually impaired police detective's argument that driving to crime scenes and collecting evidence—two functions the

detective could not perform—were not essential functions of the job. The detective argued that these functions were non-essential because the historical record revealed that situations requiring crime scene investigation occurred rarely in the detective's jurisdiction. The court, however, reasoned that "notwithstanding the historical record," it is impossible to "foretell with absolute certainty what crimes may be committed . . . in the future." *Holbrook*, 112 F.3d at 1527. The court concluded that "[e]ven assuming [a detective] spends a relatively small amount of time performing the type of field work that [the plaintiff] concedes he cannot undertake" the record nonetheless establishes that the collection of crime scene evidence is an essential function of the job. *Id.*

As in *Holbrook*, neither Bolton nor the Board can predict with certainty the frequency with which field arrests may be required in the future. Likewise, it is impossible to know whether complications may arise during the course of an arrest which would require an arresting officer to draw a weapon in order to protect herself, other officers, or the public at large. Thus, even if such situations rarely arise, the ability to carry a firearm and make field arrests may still be deemed essential functions of the job. Indeed, the evidence demonstrates—and Bolton has not proven to the contrary—that making field arrests and being qualified to carry a weapon *are* essential

functions of being an APOST-certified Probation Officer.

Bolton contends that even if making field arrests and carrying a firearm are essential functions of the job, reasonable accommodations nonetheless could have been made to allow her to maintain her employment. In support of this position, Bolton argues that the Board's past accommodation of her disability creates a factual question about whether she was qualified for her position. Specifically, Bolton points out that the Board granted her a waiver of the firearms re-qualification requirements pursuant to APOSTC Administrative Code Rule 650-X-12-.03(7) during the period between her first and second firearms test. Additionally, the Board allowed Bolton to continue performing some functions of her job, namely those which could be completed from her desk, during the interim period.

This, too, resembles the situation discussed in *Holbrook*. In *Holbrook*, the plaintiff's duties as a detective were temporarily modified by the police department after he suffered an injury. Specifically, the police department limited the plaintiff to office duties and removed him from "on call" status. The plaintiff argued because of the past accommodation, the police department should continue to retain him indefinitely in this limited capacity. The Eleventh Circuit rejected this argument, explaining:

It is equally apparent . . . that the [defendant's] previous accommodation may have exceeded that which the law requires. We do not seek to discourage other employers from undertaking the kinds of accommodations of a disabled employee as those performed by the [defendant] . . . . However, we cannot say that the [defendant's] decision to cease making those accommodations that pertained to the essential functions of [plaintiff's] job was violative of the [Rehabilitation Act].

*Holbrook*, 112 F.3d 1528.

As in *Holbrook*, the Court rejects Bolton's contention that the Board's past accommodations—i.e., waiving Bolton's firearm requirement and allowing her to continue performing desk duties pending her second weapons test—create an issue of fact as to whether she was qualified for the position as a Probation Officer. The Board did not bind itself to allowing Bolton to work indefinitely in a limited capacity simply because it granted these temporary accommodations. To rule otherwise would create the disincentive warned about by the *Holbrook* court and would discourage employers from ever temporarily granting an accommodation which impedes on the essential functions of a job position.

Moreover, the Board's temporary accommodation exceeded its legal obligation because the Board was not required by law to allow Bolton to continue performing a desk-only job. Federal regulations expressly provide the following with respect to "job restructuring":

> An employer or other covered entity may restructure a job by reallocating or redistributing nonessential, marginal job functions. . . . An employer or other covered entity is not required to reallocate essential functions. The essential functions are by definition those that the individual who holds the job would have to perform, with or without reasonable accommodation, in order to be considered qualified for the position.

29 C.F.R. Pt. 1630, App. at 344. Thus, Section 504 of the Rehabilitation Act does not require employees to modify the actual duties of a job in order to make an accommodation for individuals who are not physically capable of performing them. Having already concluded that the ability to go into the field to make arrests is an essential function of the job as a Probation Officer, the Board was therefore not legally required to restructure Bolton's job to eliminate this requirement.

Bolton's argument that the Board should have hired her for the Probation Specialist position is equally unavailing. The Eleventh Circuit has clearly held that an employer "is under no obligation to hire an employee for a non-existent job." *Sutton*, 185 F.3d at 1210 (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996) ("employers are not required to create positions specifically for the handicapped employee")). The undisputed evidence demonstrates that the Probation Specialist position was not announced until October 26, 2011, (Doc. 25-11), which was twenty days after Bolton's alleged termination date. Accordingly, even assuming Bolton was

qualified for the Probation Specialist position—a proposition the Board disputes—the Board was nonetheless not required to hire her to fill it because the position did not exist during the term of Bolton's employment.

Bolton also extensively argues that the Board should have provided an accommodation during the weapons re-qualification exam. Specifically, Bolton contends the Board should have allowed her an opportunity to cool down and for her MS to subside so she could satisfy the testing requirements notwithstanding the MS attack. The Court is not convinced that this proposed accommodation is reasonable. The re-qualification test was designed to ensure that Probation Officers were capable of effectively using their weapons in physically demanding situations, a purpose which would be undermined if Bolton were provided an accommodation to lessen the physical components of the exam. Nonetheless, even if the Board had provided the requested accommodation, this would not change the fact that in the subsequent months Bolton's health deteriorated to the point of rendering her incapable of moving about without the aid of a walker. Thus, even if Bolton successfully passed the 2010 weapons test, she would likely not have been able to pass the test in subsequent years, nor would she have been able to go into the field to make arrests. Accordingly, Bolton would not have been able to perform all the essential functions of her job as a

Probation Officer even if she passed the 2010 exam.

The Court notes that this analysis is a fact-intensive inquiry. In *Holbrook*, the Eleventh Circuit noted that its "decision is informed by several specific factors, including the unique nature of police work, the particular realities of a small police department in which each of three detectives is expected to be able to respond to any situation, and the types of accommodations proposed by [the plaintiff]." *Holbrook*, 112 F.3d at 1528 n.4. As in *Holbrook*, the Court's decision in this case is informed by several specific factors as well. Similar to police work, situations may arise when a Probation Officer is required to enter the field to make an arrest. These situations, while infrequent, are a reality of the job as a Probation Officer and have occurred in the recent past. Probation Officers are specifically trained to effect arrests and are provided equipment to do so. Finally, the type of accommodation proposed by Bolton—to be left as a Probation Officer despite her inability to carry a weapon or enter the field under any circumstances that might arise—would force the Board to eliminate an essential function of the job, and spread those duties among an already limited employee base. In consideration of these factors, the Court finds that Bolton has failed to satisfy her burden of proving that a reasonable accommodation exists which would enable her to perform the essential functions of the job as a Probation

Officer.

## V.      Conclusion

For the foregoing reasons, the Board's Motion for Summary Judgment is due

to be GRANTED. A separate order will be entered consistent with this opinion.

Done this 25th day of March 2013.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[170956]